**UNITED STATES of America, Plaintiff(s),**

v.

**CHRYSLER CORPORATION, et al., Defendant(s).**

No. 5:97CV894.

United States District Court, N.D. Ohio, Eastern Division.

Sept. 25, 2001.

---

Environmental Enforcement Section, Washington, DC, Lois J. Schiffer, Dept. of Justice, Environment & Natural Resource Div., Washington, DC, Shawn P. Mulligan, Boulder, CO, for U.S.

Steven C. Kohl, Howard & Howard, Bloomfield Hills, MI, for Chrysler Corp.

James G. O'Connor, Dickinson, Wright, Grand Rapids, MI, Margaret A. Coughlin, Rebecca L. Takacs, Dickinson, Wright, Moon, Van Dusen, Detroit, MI, for Ford Motor Co.

Daniel E. Vineyard, Richard T. Hughes, Chevron Corp., Dept. of Law, Houston, TX, for Kewanee Industries, Inc., Chevron U.S.A., Inc.

Benjamin E. Wolff, III, Eric A. Oesterle, Jeffrey C. Fort, Michael M. O'Hear, Natalie J. Spears, Susan M. Franzetti, Sonnenschein Nath & Rosenthal, Chicago, IL, James L. Moeller, Sonenschein Nath & Rosenthal, Kansas City, MO, Ray L. Weber, Renner, Kenner, Greive, Bobak & Taylor, Akron, OH, for Minnesota Mining and Mfg. Co.

Brian T. Vandervest, Katherine A. Moertl, Matthew J. Duchemin, Quarles & Brady, Milwaukee, WI, for Waste Management.

John A. Heer, Ralph E. Cascarilla, Walter & Haverfield, Cleveland, OH, for Federal Metal Co.

## MEMORANDUM OPINION

DOWD, District Judge.

This matter is before the Court on Defendant Minnesota Mining and Manufacturing Company's motion for partial summary judgment ("3M," Doc. No. 139) and Plaintiff United States' motion for partial summary judgment as to response costs ("U.S.," Doc. No. 142). Responses and replies have been filed with regard to both motions.[1]

Arthur I. Harris, Office of U.S. Atty., Cleveland, OH, Daniel C. Beckhard, Stacey H. O'Bryan, U.S. Dept. of Justice,

1. The following pleadings are cited in this opinion and will be cited by document num-

For the reasons that follow, Defendant 3M's motion for partial summary judgment is denied, and Plaintiff U.S.'s motion for partial summary judgment as to response costs is granted in part and denied in part.

### I. Background

In a previous opinion, this Court resolved the issue raised by Defendant 3M regarding the Plaintiff U.S.'s theory of recovery of its response costs incurred in remediating two parcels of land located along Hines Hill Road in Summit County, Ohio, referred to as the East and West Tracts, and known as the Krejci Dump Site (the "Site").[2] In addition, the Court granted Plaintiff U.S.'s motion for partial summary judgment as to liability, thereby entitling the U.S. to recover its response costs from Defendant 3M, who was held to be strictly liable, on a joint and several basis, pursuant to § 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C § 9607(a) ("CERCLA"). This opinion addresses the remaining issues raised by the parties, which are limited to the response costs incurred by the U.S. and the U.S.'s ability to recover those costs.

In its motion for partial summary judgment as to response costs, the U.S. seeks summary judgment as to the amount of certain specified costs that it has incurred with respect to the Site. Plaintiff U.S. asserts that it has incurred at least $23,981,563, exclusive of interest, which will be reduced by the amounts paid in response costs by the settling defendants and will be subject to equitable allocation between Defendant 3M and the U.S. Defendant 3M, however, contends that (1) Plaintiff U.S. has the burden of proving that its response costs were necessary and consistent with the National Contingency Plan (the "NC Plan") and (2) such costs were not necessary and consistent with the NC Plan. In addition, Defendant 3M states that the National Park Service (the "NPS") has failed to accurately account for over $7 million in costs claimed.

### II. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the mo-

ber only (e.g., Doc. No. X): Defendant 3M's motion for partial summary judgment (Doc. No. 139) with memorandum in support (Doc. No. 140); Plaintiff's motion for partial summary judgment as to response costs (Doc. No. 142) with memorandum in support (Doc. No. 143); Defendant's response to Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Motion for Partial Summary Judgment as to Response Costs (Doc. No. 162); Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment as to Response Costs (Doc. No. 163); Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment (Doc. No. 165); Defendant 3M's reply to Plaintiff's opposition

to Defendant's statement of uncontroverted material facts (Doc. No. 172); and this Court's Memorandum Opinion denying Defendant 3M's motion for partial summary judgment with respect to the argument that the U.S. is limited to an action for contribution under CERCLA section 113(f) and granting Plaintiff's motion for partial summary judgment as to liability (Doc. No. 188).

2. See Doc. No. 188. The Court will not recite the facts underlying this matter. Rather, a complete recitation of the facts can be found in this Court's earlier opinion, which will be published in the Federal Supplement, second edition. See U.S. v. Chrysler Corp. et al., 157 F.Supp.2d 849 (N.D.Ohio 2001).

tion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." *Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984)). Further, " '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505.

### III. Discussion

#### A. Recovery of Response Costs under CERCLA

CERCLA was enacted by Congress in 1980 and is "the primary statutory means by which harmful or potentially harmful hazardous waste disposal sites are remediated." *Centerior Service Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 347 (6th Cir.1998). Parties who incur cleanup costs in remediating a hazardous waste disposal site may seek to recover the response costs by bringing one of two causes of action: (1) a joint and several cost recovery action pursuant to § 107(a) of CERCLA, 42 U.S.C. § 9607(a); or (2) a contribution action pursuant to § 113(f) of CERCLA, 42 U.S.C. § 9613(f)(1).

The Court, in an earlier opinion, held that the U.S. has established a prima facie case of liability against Defendant 3M under CERCLA § 107(a).[3] In addition, the Court rejected Defendant 3M's argument that it was entitled to a defense under § 107(b)(3).[4] The Court, however,

---

**3.** In order to establish a prima facie case under § 107(a), the plaintiff must prove four elements: (1) that the defendant falls within one of the four categories of PRPs; (2) that the site is a facility; (3) that a release or threatened release of hazardous substance has occurred; and (4) that the release has caused the plaintiff to incur response costs. *Centerior*, 153 F.3d at 347–48 (citing *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989); *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1358 (9th Cir.

1990)). This issue was decided in the Court's earlier opinion. *See supra* note 2 and accompanying text.

**4.** This defense is commonly referred to as the "Third Party Defense" and requires the defendant to prove the following elements: (1) that another party was the sole cause of the release of hazardous substances and the damages caused thereby; (2) that the other, responsible party did not cause the release in connection with a contractual, employment

did not address the amount of response costs actually incurred by the U.S., as the Court was satisfied that the U.S. had incurred *some* amount of response costs. The amount actually incurred is now at issue.

■ In support of its motion for partial summary judgment as to response costs, the U.S. has submitted extensive documentation that it incurred $23,981,563 in response costs. The documentation includes affidavits of various EPA and DOI employees responsible for accumulating the cost data. In addition, the U.S. has submitted summaries of cost data for the Krejci site. This data is broken down into categories representing personnel costs, travel costs, contractor costs, and indirect costs. The cost packages for the following contractors are also provided: MAECORP, Weston, Ebasco, and R & R.

Accordingly, the Court holds that the documentation offered in support of the U.S.'s response cost claim establishes a prima facie case that the U.S. is entitled to response costs in the amount of $23,981,563.[5] *See U.S. v. Hardage,* 982 F.2d 1436, 1442–43 (10th Cir.1992), *cert. denied, Advance Chem. Co. v. U.S.,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993). As a result, 3M is strictly liable on a joint and several basis, and Plaintiff U.S. is entitled to recover the entire costs of remediation from 3M, to the extent they were not inconsistent with the NC Plan, without having to prove the extent of 3M's liability. *See Centerior,* 153 F.3d at 348 (citing *U.S. v. Colorado & Eastern Railroad,* 50 F.3d 1530, 1535 (10th Cir.1995); *New Castle County v. Halliburton NUS*

or agency relationship with the defendant; and (3) that the defendant exercised due care and guarded against the foreseeable acts or omissions of the responsible party. *See U.S. v. Meyer,* 120 F.Supp.2d 635, 640 (W.D.Mich. 1999) (citing *Westfarm Associates v. Washing-*

*Corp.,* 111 F.3d 1116, 1121 n. 4 (3d Cir. 1997); *O'Neil v. Picillo,* 883 F.2d 176, 178 (1st Cir.1989)).

## B. Burden of Proof

■ Before considering whether the NPS's actions were consistent with the NC Plan, the Court must first address Defendant 3M's argument that the U.S. bears the burden of proving that the costs incurred were both consistent with the NC Plan and necessary.

Section 107(a)(4) provides that a potentially responsible party ("PRP") shall be liable for:

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a)(4)(A)–(D). Defendant 3M argues that, because the NPS is a PRP, the federal government is treated the same as a private party by virtue of CERCLA § 120(a), which provides as follows:

*ton Suburban Sanitary Comm'n,* 66 F.3d 669, 682 (4th Cir.1995)).

5. This figure is an estimated figure. The actual amount of costs the U.S. alleges it incurred is $23,981,564.80. (*See* App. 1, attached hereto).

Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title. Nothing in this section shall be construed to affect the liability of any person or entity under section 9606 and 9607 of this title.

42 U.S.C. § 9620(a)(1). Accordingly, 3M contends that the U.S. is entitled to recover only those costs that are both necessary *and* not inconsistent with the NC Plan and that the U.S. bears the burden of proving both necessity and consistency.[6] The Court disagrees.

Pursuant to § 120(a), the United States has waived sovereign immunity with respect to the liability of the federal government under CERCLA. This waiver of immunity, however, does not affect the U.S.'s ability to recover costs under § 107(a)(4) or the burden of proof with respect to those costs. Section 107(a) renders PRPs liable for *all* costs incurred by the U.S. and does not distinguish between the U.S. when it is a PRP and when it is not. Moreover, § 107(a) begins by stating, "*Notwithstanding* any other provision or rule of law," which thereby renders PRPs liable for all costs incurred by the U.S., notwithstanding any other provision or rule of law—including § 120(a).[7]

Defendant 3M attempts to distinguish between the cleanup activities of the EPA and those of the NPS. According to 3M,

the EPA acted as a regulatory agency within its area of administrative expertise in responding to the Site, while the NPS acted as a market participant. Defendant 3M argues that "a governmental agency that is a PRP and acts as 'market participant' or otherwise in a manner unlike a regulatory body in its efforts to clean up a site, should be held to the same burden of proof as a private PRP." (Doc. No. 163, at pp. 8–9) (internal citations omitted). The Court, however, need not address the merits of this argument, given that 3M has offered no evidence supporting the conclusion that the U.S. acted as a market participant. Moreover, the Court rejects 3M's distinctions between the EPA and the NPS.

Accordingly, as this is an action for response costs incurred by the federal government the burden is on Defendant 3M to show that the actions of the federal government were inconsistent with the NC Plan. *See Sherwin–Williams Co. v. City of Hamtramck*, 840 F.Supp. 470, 474 (E.D.Mich.1993) (citing *U.S. v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 746 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987)); *City of Philadelphia v. Stepan Chemical Co.*, 713 F.Supp. 1484, 1486 (E.D.Pa.1989); *see also U.S. v. Pretty Products Inc.*, 780 F.Supp. 1488, 1500 (S.D.Ohio 1991) ("Thus, the statutory language [§ 107(a)(4)(A) ] establishes an exception for costs that are inconsistent with the NC Plan, and ... the party claiming the benefit of the exception, has 'the burden of proving that certain costs are inconsistent with the NCP and, therefore, not

---

**6.** This is the burden on private parties who bring suit under § 107(a) to recover response costs incurred.

**7.** Section 107(a) of CERCLA begins with the following language:

"Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section...." 42 U.S.C. § 9607(a). This section then goes on to list the four categories of PRPs and then states the costs for which such parties are liable.

recoverable.' ") (quoting *U.S. v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 747 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102, (1987)). *But cf. Sherwin–Williams*, 840 F.Supp. at 474–75 (stating that, in an action "by any other person," the burden is on the party bringing suit to prove *both* necessity and consistency).

## C. Consistency with the NC Plan

 The NC Plan is a series of regulations promulgated by the EPA, which "defines procedures and standards for waste site cleanups, and its purpose 'is to give some consistency and cohesiveness to response planning and actions.'" *Channel Master Satellite Systems, Inc. v. JFD Electronics Corp.*, 748 F.Supp. 373, 381–82 (E.D.N.C.1990). The NC Plan is set forth at 40 C.F.R. Part 300. During the span of time in which the U.S. conducted its response activities, two versions of the NC Plan have been in effect—the 1985 version and the 1990 version. Accordingly, the Court must first determine which version is applicable.

The 1985 version of the NC Plan underwent a substantial revision, which took effect on April 9, 1990 and applies to costs incurred on or after that date. *See* 55 Fed.Reg. 8666 (March 8, 1990). The U.S. argues that, because the inconsistencies alleged by 3M relate to procedural steps required before selecting a response action, it is logical to apply the version of the NC Plan that was in effect at the time the response action was selected. Based on this argument, the U.S. contends that the 1985 version sets the operative standards

for all the costs incurred. This position, however, is contrary to case law.

Courts that have addressed this issue have held that consistency with the NC Plan should be determined in light of the version of the NC Plan in effect *when the response costs were incurred* as opposed to when the response actions were initiated or when the claims for cost recovery are evaluated. *See NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986); *City of Philadelphia v. Stepan Chem. Co.*, 748 F.Supp. 283, 290 (E.D.Pa.1990). Accordingly, the Court must address when the various response costs were incurred to determine which version of the NC Plan is applicable.

The EPA conducted the first phase of this removal action. Onsite activity began in June of 1987 and continued until approximately May of 1989. As a result, recovery of response costs for activities conducted during this phase will be limited to those that are not inconsistent with the 1985 version of the NC Plan. The remaining activities occurred in 1990 or later. Accordingly, the 1990 version of the NC Plan will be used to evaluate the costs incurred during Phases 2, 3, and 4.[8]

 Any response costs that are consistent with the NC Plan are conclusively presumed to be reasonable. *See Northeastern*, 810 F.2d at 747. To avoid liability for costs, Defendant 3M must show not only inconsistency with the NC Plan, but also that the cleanup caused by the inconsistency with the NC Plan resulted in excess costs. *See O'Neil v. Picillo*,

---

8. The Court need not be concerned with whether any of the Phase 1 activities were conducted *after*, or, alternatively, whether any of the Phase 2 activities were conducted *before*, the 1990 version of the NC Plan went into effect. The fact that a majority, if not all, of the Phase 1 activities were conducted before 1990 is sufficient to render the 1985 version of the NC Plan applicable to these costs. In addition, a majority of the activities conducted in conjunction with Phase 2 occurred after the effective date of the 1990 version of the NC Plan, which is sufficient to render the 1990 version of the NC Plan applicable to these costs.

682 F.Supp. 706, 729 (D.R.I.1988), *aff'd,* 883 F.2d 176 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990). While the NC Plan requires that remedial action measures be cost effective, there is no similar cost effective requirement for removal actions like the one before the Court. *See J.V. Peters & Co. v. Adm'r E.P.A.,* 767 F.2d 263, 266 (6th Cir.1985); *Sherwin–Williams,* 840 F.Supp. at 476.[9] Although the parties do not dispute that the U.S. seeks recovery of response costs incurred as a result of its removal action, Defendant 3M attempts to treat the response activities of the EPA as one removal action and the response activities of the NPS as a second removal action.

A similar argument was before the court in *Kelley, ex rel. State of Michigan v. E.I. duPont de Nemours and Company,* 786 F.Supp. 1268, 1273–74 (E.D.Mich.1992). Just as 3M does not dispute liability for costs up to May of 1989, the defendants in *Kelley* only disputed their liability for costs incurred before a certain date. Viewing the removal action at issue in *Kelley* as two separate removals, the defendants argued that the statute of limitations applicable to these types of actions had run on the first removal action.

In reviewing the magistrate judge's decision rejecting the defendants' argument, and thereby finding one continuous removal action, the court determined that this decision was consistent with the definition of removal, which expressly included "cleanup," "removal," and "disposal" of hazardous substances in addition to "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances ... or ... such other action as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment...." *Id.* at 1277 (internal citation omitted). In addition, the court said that this decision was "consistent with the decisions of other courts that have been called upon to determine what kinds of other 'non-listed' activities constitute removal actions" and with "the broad and liberal construction of CERCLA which courts—including the Sixth Circuit—have held must be given to the statute's provisions to effectuate the goals and intention of Congress." *Id.* (citing *Anspec Co. v. Johnson Controls, Inc.,* 922 F.2d 1240 (6th Cir.1991); *U.S. v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100 (D.Minn.1982)). Accordingly, the court agreed that the response activities constituted only one removal action—despite the fact that there was over a one-year gap between removal activities and different cleanup contractors for the two removals.

Relying on a similar "two separate removals" argument, Defendant 3M con-

---

9. Removal actions are defined as:
 the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release.... The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals....
 42 U.S.C. § 9601(23).

 All other responses are termed remedial actions, which are defined as:
 those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes ... neutralization, cleanup of released hazardous substances and associated contaminated materials....
 42 U.S.C. § 9601(24).

tends that the NPS ignored the NC Plan in its selection of a remedy, in its failure to prepare an Engineering Evaluation/Cost Analysis ("EE/CA"), and in its failure to satisfy the public participation requirements of the NC Plan. (*See* Doc. No. 140, at pp. 16–26).

First, 3M argues that the NPS made fundamental cleanup decisions without following the NC Plan process. According to 3M, the NPS came to the Site with a predetermined choice of remedy— to remove all foreign material, whether or not it is hazardous, and to restore the Site to natural park-like conditions—without following the NC Plan's performance standards, methods, and criteria for investigating and responding to releases of hazardous substances. The U.S. states, in response, that 3M is essentially challenging the response action selected by the President's delegate under CERCLA based on how the responsibility for this removal action ultimately came to reside with the NPS.[10] Moreover, the U.S. contends that the NC Plan contains few provisions regarding implementation of a remedy that has been selected in compliance with the NC Plan requirements.

As discussed by the U.S. in response to Defendant 3M's motion for partial summary judgment, the decision to commence a removal action at the Site was made by the EPA in June of 1987 and was based on a finding of an imminent and substantial threat to human health and the environment. (*See* Doc. No. 165, at p. 16). Moreover, the evidence indicates that the EPA recognized, from the beginning, that the removal action would consist of more than one phase and that a complete surface cleanup would be involved. (*See* Doc. No. 142, at ex. B–5, p. 4).[11] In assuming responsibility for the removal action, the NPS entered into a Memorandum of Agreement with the EPA, which confirmed that the Site response action would include the removal and off-site disposal of both hazardous and non-hazardous materials. *See id.*

The evidence establishes that the EPA selected the response action for the Site. Moreover, Defendant 3M does not contest that the EPA complied with the NC Plan requirements. Accordingly, 3M's challenges to the NPS's selection of a remedy are without merit.[12]

---

10. The EPA exercised its authority under CERCLA § 104 in initiating the first phase of the removal action. The agreement between the EPA and the NPS, by which the NPS assumed responsibility for removal work, was authorized by section 2(e)(1) of Executive Order 12580, 52 Fed.Reg. 2923 (Jan. 29, 1987). This executive order delegated the President's authority to select and take response actions "to the heads of Executive departments and agencies, with respect to ... removal actions other than emergencies, where either the release is on or the sole source of the release is from any facility ... under the jurisdiction, custody or control of those departments and agencies...." 52 Fed.Reg. 2923 (Jan. 29, 1987). The Secretary of the Interior redelegated this authority to the NPS with respect to units managed by the NPS, through delegations contained in the DOI manual and Secretarial Order 3201.

11. The EPA, in discussing Phase 1, stated, "This first phase is designed to facilitate a second phase which will consist of a complete surface cleanup." (Doc. No. 142, at ex. B–5, p. 4.)

12. Defendant 3M's position that NPS selected a particular response activity for the purpose of restoring the Site to park-like condition is also without merit. The NPS first acquired the land pursuant to a Congressional mandate, which established the Cuyahoga Valley National Park and the park's boundaries and directed the Secretary of Interior to acquire the property located within those boundaries. The NPS's purpose with respect to its removal activities was the same as the EPA's purpose in initiating the removal action—to protect human health and the environment. (*See* Doc. No. 172, at stmt. 22).

■ Second, 3M maintains that the NPS failed to comply with the NC Plan in not preparing an EE/CA, which would identify the objectives of the removal action and analyze the effectiveness, implementability, and cost of various alternatives.[13] As the removal actions for the Site were selected by the EPA, the EPA would be required to comply with the NC Plan provisions regarding the selection of a removal action.

According to the U.S., the EPA followed the steps of the 1985 NC Plan (*i.e.*, the NC Plan in effect at the time response costs were incurred by the EPA).[14] Consistent with § 300.65 of the 1985 NC Plan, the EPA "conducted the requisite investigation, made the requisite findings, and selected the contemplated response actions, including the removal of drums, soils, and contaminated soils." (*See* Doc. No. 142, at ex. B–5, 2 & 17 & Doc. No. 165, at p. 22). Moreover, 3M's contention that a separate EE/CA is required for each phase of the removal action is incorrect.

■ Finally, Defendant 3M argues that the NPS failed to comply with the public participation requirements of the NC Plan. The public participation requirements Defendant 3M refers to are those in the 1990 version of the NC Plan. Pursuant to the 1990 version of the NC Plan, the lead agency must (1) prepare and implement a formal community relations plan (CRP); (2) establish and maintain at least one current information repository at or near the location of the response action; (3) publish notice of and seek comment on the EE/CA, and (4) solicit and allow public comment on the proposed removal action. *See* 40 C.F.R. §§ 300.415(n) & 300.820 (2000).

The public participation requirements relied upon by Defendant 3M all appear to take place prior to, and at the beginning of, a removal action. The removal action before the Court consists of four phases, and the first phase began in 1987 and was conducted by the EPA. Accordingly, the EPA was the lead agency responsible for satisfying those public participation requirements that take place prior to, and at the beginning of, a removal action. Moreover, whether or not the EPA's acts were consistent with the NC Plan is evaluated by applying the 1985 version of the NC Plan, which was in effect at the time the EPA incurred response costs. However, because 3M does not contest the EPA's compliance with the NC Plan, the Court need not address this argument.[15] Moreover, Defendant 3M has not presented any evidence supporting a finding that any of the public participation requirements of the 1990 NC Plan, which create ongoing obligations, have been violated by the

13. An EE/CA is an analysis of removal alternatives for sites that have more than a six-month planning period. *See* 40 C.F.R. § 300.415(b)(4)(i).

14. The 1985 version of the NC Plan did not require an EE/CA, as this requirement was first included in the 1990 version of the NC Plan. The version of the NC Plan that applies, as discussed previously, is the version in effect at the time the response costs were incurred. The EE/CA, if required, would be completed prior to initiating any removal activity. The removal activity in this case was first initiated pre–1990; therefore, the Court concludes that the 1985 version of the NC Plan would apply in evaluating any inconsistencies regarding the need for an EE/CA.

15. Regardless, the EPA did implement various public participation activities. For instance, the EPA, consistent with 40 C.F.R. § 300.67 (1985), developed a community relations plan. (*See* Doc. No. 142, at ex. B–18). In addition, the EPA made reports on the progression of Site activities available to the community and media as requested and established a Site Administrative Record at the Akron–Summit County Library in April 1990, which is consistent with CERCLA § 113(k)(1). *See id.* at exs. B–2, B–26 & B–27.

NPS. Accordingly, this argument is rejected.

■ The final inconsistencies raised by Defendant 3M relate to the particular costs incurred during each of the phases by the various agencies. To establish an inconsistency, 3M must prove that the agency's actions were arbitrary and capricious. *Id.* at 748. Defendant 3M attempts to meet its burden by alleging that the U.S.'s documentation of expenses does not satisfy the NC Plan standard, and, from an accounting perspective, does not form an adequate basis for cost recovery in violation of 40 C.F.R. § 300.160 (1990).[16]

The U.S., in its memorandum in support of its motion for partial summary judgment as to response costs, breaks down the costs it has incurred by attributing the costs to the agency that incurred those costs on behalf of the U.S. (*See* Doc. No. 143, at tbl. 1). Accordingly, the Court will evaluate, separately, the costs incurred by the EPA, the Bureau of Reclamation ("BOR"), the DOJ, and the NPS.

### 1. EPA Costs

The U.S. EPA initiated the first phase of the removal action pursuant to its authority under CERCLA § 104. During Phase 1, metal drums and soil were sampled, contaminants were identified, hazardous materials were segregated and "staged," the on-site lagoon was dewatered and treated, nonhazardous site material was removed in order to facilitate removal of hazardous materials, and hazardous materials were removed and disposed. The primary contractor for Phase 1 activities was MAECORP, Inc. ("MAECORP"). The cost of these activities, according to the U.S., was $4,527,246.16.[17]

Defendant 3M does not contest the activities engaged in by the EPA; however, 3M does contest the costs incurred by the EPA. (*See* Doc. No. 162, at stmts. 24–26). With regard to the costs, 3M does not contest the regional payroll costs, the EPA

---

**16.** This section requires the following;

During all phases of response, the lead agency shall complete and maintain documentation to support all actions taken under the NCP and to form the basis for cost recovery. In general, documentation shall be sufficient to provide the source and circumstances of the release, the identity of responsible parties, the response action taken, accurate accounting of federal, state, or private party costs incurred for response actions, and impacts and potential impacts to the public health and welfare and the environment. Where applicable, documentation shall state when the NRC received notification of a release of a reportable quantity. 40 C.F.R. § 300.160 (1990). The 1985 version of the NC Plan contained a similar provision, which would apply to the costs incurred by the EPA. *See* 40 C.F.R. § 300.69 (1985).

**17.** This figure represents a total of the following costs incurred by the EPA:

| | | |
|---|---|---|
| Regional Payroll Costs | $ 69,052.34 | Not Contested |
| EPA Indirect Costs | $ 193,743.80 | Not Contested |
| Regional Travel Costs | $ 14,849.03 | Not Contested |
| Headquarter Travel Costs | $ 384.69 | Not Contested |
| Emergency Removal Cleanup (ERC) Contract | | |
| MAE Corporation | $ 3,958,886.43 | Contested |
| Field Investigation Team (FIT) Contract | | |
| Ecology and Environment | $ 560.01 | Not Contested |
| Technical Assistance Team (TAT) Contract | | |
| Roy F. Weston | $ 264,388.16 | Contested |
| Technical Enforcement Support (TES) Contract | | |
| Jacobs Engineering | $ 23,172.31 | Contested |
| Metcalf & Eddy | $ 2,209.39 | Not Contested |
| **TOTAL SITE COSTS:** | **$ 4,527,246.16** | |

*See* Doc. No. 142, at ex. G–1.

indirect costs, the regional and headquarter travel costs, the contractor costs for Ecology and Environment, or the contractor costs for Metcalf & Eddy. (*See* Doc. No. 162, at stmts. 33, 35, 39, 61 & 64).[18] Accordingly, the Court will focus only on the contractor costs associated with MAECORP, Roy F. Weston, and Jacobs Engineering.

### a. MAECORP Contractor Costs

 With respect to MAECORP, Defendant 3M disputes that the alleged expenditures of MAECORP are properly documented. According to 3M, the U.S. has provided inadequate documentation to support approximately $2,566,591 in MAECORP costs. More particularly, 3M states that project daily summaries, project daily details, reimbursable travel and subsistence logs, contractor personnel reports, equipment usage logs, and subcontractor reports have not been produced for MAECORP.

 The NC Plan does not contain any specific standards concerning the documentation of costs. *See U.S. v. Findett Corp.*, 75 F.Supp.2d 982, 991 (E.D.Mo. 1999). Rather, it provides that, to comply with 40 C.F.R. § 300.69 (1985), documentation forming the basis for cost recovery must be maintained. Moreover, such documentation must be sufficient to provide accurate accounting of federal, state, or private party costs incurred for response actions. 40 C.F.R. § 300.69. The regulation, however, does not define "accurate accounting" and does not elaborate on

what is meant by "sufficient" documentation. *See Findett Corp.*, 75 F.Supp.2d at 991.

The documentation before the Court with respect to MAECORP consists of invoices from MAECORP, a Certification of Invoice and/or Invoice Acceptance Form, and proof of payment in the form of an EPA Contract Disbursements Treasury Schedule.[19] The Court has reviewed these documents and concludes that the documentation provided is adequate to support the contractor costs of MAECORP that the EPA incurred. Accordingly, the Court will review the accuracy of the costs claimed by the EPA, which total $3,958,886.43.

In lieu of beginning with the amount claimed by the EPA, the Court begins by totaling the. amounts paid per invoice. There are a total of 47 invoices submitted by MAECORP. These invoices span the period of July 2, 1987 through July 28, 1989. Of these, 44 follow the same form, breaking down the total amount charged into eight categories: (1) labor; (2) travel and subsistence; (3) equipment; (4) materials; (5) subcontractor; (6) transportation; (7) disposal; and (8) analytical. In addition, the invoices are divided into three columns: column one identifies the category for which the charge falls; column two states the amount currently due; and column three provides a cumulative total of the amounts charged for each category. Invoice number 45 is the last invoice, which follows this form, and it provides the following breakdown of costs: [20]

---

18. In Defendant 3M's motion for partial summary judgment, 3M states that it is not contesting the costs incurred by the EPA. Although the Court initially interpreted this statement as a concession by 3M to the EPA's costs, 3M's response to the U.S.'s motion for partial summary judgment as to response costs convinces the Court otherwise, as 3M is challenging certain contractor costs incurred by the EPA.

19. These documents are extremely voluminous—totaling over 475 pages.

20. The last invoice is actually invoice number 46, but, as the Court will discuss *infra*, this invoice follows a different form. Invoice 45 is reproduced solely to provide the reader with a clearer understanding of the form of the invoices, as the Court did not rely on the totals provided on this invoice.

| CATEGORY | CURRENT | CUMULATIVE |
|---|---|---|
| LABOR | $ .0.00 | $ 770,425.76 |
| TRAVEL AND SUBSISTENCE | $ 2,333.70 | $ 203,521.97 |
| EQUIPMENT | $ 0.00 | $ 194,266.25 |
| MATERIALS | $ 1,567.10 | $ 329,637.49 |
| SUBCONTRACTOR | $15,376.28 | $ 409,919.42 |
| TRANSPORTATION | $ 448.50 | $ 246,753.75 |
| DISPOSAL | $ 0.00 | $1,609,046.21 |
| ANALYTICAL | $ 325.00 | $ 187,665.26 |
| **TOTAL AMOUNT OF INVOICE** | $20,050.58 | $3,951,236.11 |
| **UNCLASSIFIED DEDUCTIONS** | | $ (4,527.73) |
| **CORRECTED TOTAL:** | | $3,946,708.38 |

Invoice numbers 38, 46, and 5207 do not follow the same form as invoice number 45; rather, invoice numbers 46 and 5207 are adjustments for "other direct costs" and invoice number 38 represents an adjustment for "indirect costs." Invoice number 38 is for the amount of $75,541.29, while invoice numbers 46 and 5207 are for the amounts of $3,702.42 and 28,290.54.[21]

 Excluding invoice numbers 38, 46, and 5207, the Court added the total amount of each of the forty-four invoices, which resulted in a figure of $3,850,352.18. The Court excluded the amounts in invoice numbers 46 and 5207 because there was no explanation offered as to why the full

amount of invoice number 46 was included while only approximately $28,000 of invoice number 5207 was included. In addition, although indirect costs are ordinarily allowed, the Court excluded the amount of invoice number 38 because the U.S. has failed to direct the Court to, and the Court is unable to find, any formula supporting the calculation of indirect costs billed by MAECORP.[22] The Court then subtracted from this amount the unclassified deductions of $4,527.73, which appear on invoice number 45.[23] This leaves a corrected total of $3,845,824.45.[24]

Accordingly, the Court holds that the U.S. has adequately and accurately docu-

**21.** Invoice number 5207 indicates a charge of $283,735.27; however, the U.S. only includes $28,290.54 of this amount.

**22.** Indirect costs are those, which are necessary to the operation of the program and support of the Site cleanup efforts, but which cannot be directly identified to the efforts of any one site. *See U.S. v. Northernaire Plating Co.,* 685 F.Supp. 1410, 1418 (W.D.Mich. 1988). The "Negotiated Indirect Cost Agreement" submitted within exhibit G–3 only provides the percentage agreed upon by the parties. There is no justification provided for this percentage, or, alternatively, any discussion regarding the procedure followed in making this determination.

**23.** Invoice number 45 was the last invoice that followed this form. Although the Court did not rely on the totals provided in this invoice, the Court wanted to give 3M the

benefit of the deduction taken in invoice number 45.

**24.** To summarize, this total was calculated by adding the amounts invoiced in forty-four of the forty-seven invoices (*i.e.,* $3,850,352.18). From this amount, the Court subtracted unclassified deductions of $4,527.73, which leaves a total of $3,845,824.45. The Court is not certain how the U.S. arrived at its total of $3,958,886.43. If the Court were to add the total of the three excluded invoices (*i.e.,* $107,534.25) with the total of the remaining forty-four invoices, the total would be $3,953,358.70. Even by adding back in the unclassified deductions from invoice number 45 (*i.e.,* $4,527.73), the total would only be $3,957,886.43, which still leaves a difference of $1,000.00.

mented costs attributable to MAECORP in the amount of $3,845,824.45, and that 3M has failed to raise any issue of material fact with respect to the same. Therefore, the U.S. is entitled to summary judgment with respect to these costs.

### b. Weston Contractor Costs

■ Defendant 3M raises similar objections to the contractor costs of Roy F. Weston. According to Julie Sidlow, a cost accountant with the EPA, Weston performed field investigations for numerous sites, including the Krejci dump site. (*See* Doc. No. 142, at ex. A–7). As a result, Weston's invoices often cover more than one site. The charges attributable to the Krejci site, however, can be identified by the Site number. The U.S. has submitted the following documents in support of the costs attributable to Weston: a voucher and/or invoice from Weston, a Project Officer Invoice Approval, a Site–Specific Invoice showing charges for the Krejci dump site, and proof of payment in the form of an EPA Contract Disbursements Treasury Schedule. Again, the Court concludes that the documentation provided is adequate to support the costs incurred.

In order to verify costs attributed to Weston, the Court has reviewed the docu- ments, paying particular attention to the Site–Specific Invoice, which identifies those costs associated with the Krejci dump site by the site number "6T" and the site name "OH Krejci Drums." As with the MAECORP contractor costs, the Court did not begin by accepting, as accurate, the amount claimed by the U.S. (*i.e.*, $264,388.16); rather, the Court examined every voucher, verifying and totaling the amounts paid on each voucher.

Although Weston submitted thirty-four vouchers, the Court disregarded two of these vouchers—voucher numbers 35 and 51—because the Site–Specific Invoices that correspond to these vouchers differed in form from the other Site–Specific Invoices.[25] The Court totaled the individual charges on each of the thirty-two remaining Site–Specific Invoices and verified this amount with the amount that appeared on the line that reads "DIRECT 6T." [26] The Court then added these totals together to arrive at the site-specific costs attributable to Weston. This amount is $117,781.31.[27]

■ The remaining costs for which the U.S. seeks recovery are Weston's annual allocation amounts. The declaration of Charles Young, an accountant with the EPA, addresses in detail the annual alloca-

25. With the exception of the Site–Specific Invoices pertaining to voucher numbers 35 and 51, all of the invoices identified the individual costs incurred by a "REG/TDD MRK NUM." In addition, the line following the individual costs is setoff by a tab and reads "DIRECT 6T." This line provides the total of the charges for the Krejci dump site and has a class code of 2535. The invoices submitted with voucher numbers 35 and 51 only have the last line, which reads "DIRECT 6T" followed by the class code and the amount. Given this irregularity, the Court has disregarded these invoices.

26. The Court found only one instance where the amount listed on the "DIRECT 6T" line was incorrect. The Site–Specific Invoice for voucher number 45 listed the cumulative total as $2,686.24. The Court, however, added the individual charges of $105.28 and $2380.70 and came up with a total of $2485.98. The corrected amount was used in calculating the contractor costs attributable to Weston.

27. Voucher number 17 invoiced the following charges in the amounts of $61.21; $2242.07; and $1217.18, which add up to a total charge of $3520.46. The Site–Specific Invoice accompanying voucher number 17 is difficult to read; therefore, the Court is unsure whether it is misreading the numbers or whether the U.S. only paid $3510.46 as stated in the cost summary for Weston contained in exhibit G–1. Regardless, the U.S. is only seeking recovery for $3510.46 so the Court reduced its figure by the sum of $10.

tion process, whereby the EPA allocates to sites those non-site-specifically charged costs that, nevertheless, support, benefit or relate to site response actions. (*See* Doc. No. 142, at ex. A–6, ¶¶ 21–27). The EPA determines an allocation rate for each contract that involves both site and non-site-specific work. This rate is based on an Annual Allocation report prepared by the contractor, which is submitted to the EPA where it is reviewed by EPA staff in the Program and Cost Accounting Branch of the Financial Management Division. *Id.* at ¶ 23. The non-site-specific costs charged to the EPA by the contractor are then determined by multiplying the direct site amount costs by this rate.

Although the Court has described the allocation methodology in simplified terms, the EPA has produced sufficient documentation in the form of Young's declaration and the EPA's Superfund Indirect Cost Manual, which is attached to Young's declaration. Moreover, Defendant 3M has failed to identify any provision of the NC Plan that the procedure used by the EPA violates. Accordingly, the Court need only verify whether Weston's allocation rate was properly applied to the amounts invoiced by Weston for site-specific activities.

The U.S. seeks recovery of annual allocation costs in the amount of $139,981.39. However, because the Court excluded from recovery the amounts charged in invoice numbers 35 and 51, the Court also excludes from recovery the annual allocation amounts charged with respect to those invoices. In addition, the Court corrected the annual allocation amount for invoice number 45 by multiplying the annual allocation rate by the total the Court determined was correct for that invoice.[28] Taking into account these reductions and exclusions, the total amount of annual allocation costs that are adequately and accurately documented is $132,515.81. The total costs incurred by the EPA in Weston contractor costs is $250,297.12.[29]

### c. Jacobs Engineering Contractor Costs

■■■ The final inconsistency raised by Defendant 3M to the costs incurred by the EPA involve the contractor costs of Jacobs Engineering. Again, 3M contends that the costs are not accurately accounted for or adequately documented.

According to the U.S., the contractor costs for Jacobs Engineering total $23,172.31. Of this amount, 3M argues that the U.S. has failed to produce adequate documentation for approximately $5,200 in costs. The EPA report for Jacobs Engineering breaks down the figure of $23,172.31 as follows: $17,971.60 represents the amount invoiced by Jacobs Engineering, and $5,200.71 is the amount for annual allocation. It is only this latter amount that Defendant 3M argues is inadequately and inaccurately documented.

---

28. *See supra* note 26.

29. This amount is the total of site-specific charges ($117,781.31) plus the annual allocation costs ($132,515.81). The difference between this amount and the amount claimed by the U.S. (*i.e.*, $264,388.16) is $14,091.04. This difference represents the site-specific amount and annual allocation amounts of the two excluded invoices (*i.e.*, $13,744.44), plus the difference between the amount claimed and the amount adequately and accurately represented in voucher number 45, as ex-

plained in footnote 26 (*i.e.*, $425.63), less the deductions taken by the U.S. with respect to Journal Voucher 2128 (*i.e.*, $79.03). Based on this journal voucher, the U.S. subtracted $41.59 from Weston's contractor costs and $37.44 from Weston's allocated amount. In reviewing this voucher, the Court could not determine how these amounts were calculated. Moreover, in event the deductions taken in Journal Voucher 2128 should have been greater, the Court excluded these deduction from its calculations.

The methodology used to determine the annual allocation amounts for Jacobs Engineering is the same that was employed by the EPA with respect to Weston. The Court reviewed that methodology in the previous section and determined that it was not inconsistent with any provision of the NC Plan. As a result, the Court need only address whether the allocation rate was properly applied to the amounts invoiced by Jacobs Engineering.

The annual allocation rate for Jacobs Engineering was 0.289386. (*See* Doc. No. 142, at G1). The cost summary for Jacobs Engineering lists both the "Site Amount" and the "Annual Allocation." The site amount represents Jacobs Engineering's site-specific charges and are identified by both voucher number and date. The annual allocation amount was determined by multiplying the site specific amount by the rate of 0.289386. Having found the documentation supporting these costs adequate, the Court reviewed these costs for accuracy. Based upon this review the Court concludes that the U.S. is entitled to summary judgment with respect to the $17,971.60 invoiced by Jacobs Engineering

and the $5,200.71 in annual allocation costs, for a total of $23,172.31.

### 2. BOR Costs

The BOR became involved with the Site in November of 1988 by providing personnel to serve as On–Scene–Coordinators for the ongoing removal action. At the conclusion of Phase 1, the NPS requested the BOR to continue the management of the Site response action. As a result of its involvement, the BOR incurred costs in the amount of $17,764,945.00.[30] Defendant 3M only disputes the contractor costs of R & R International, Inc. ("R & R"), the BOR's personnel costs, and the BOR's indirect costs. Moreover, the Court is satisfied that the documentation provided in support of these non-contested costs is adequate and accurate and that no material issue of fact exists to prevent to the Court from granting summary judgment with respect to these costs. Accordingly, the Court will limits its review to the contested costs.

### a. R & R Contractor Costs

▮ The U.S. states that it paid $5,312,577 to R & R for work performed as

---

**30.** This figure represents a total of the following costs incurred by the BOR:

| BOR Contractors | | |
|---|---|---|
| Ebasco/Foster Wheeler | $ 4,902,574.00 | Not Contested |
| R & R | $ 5,312,577.00 | Contested |
| Harza | $ 217,263.00 | Not Contested |
| Woodward–Clyde | $ 183,120.00 | Not Contested |
| CASU | $ 268,380.00 | Not Contested |
| Rocky Mtn. Bank Card | $ 135,702.00 | Not Contested |
| Misc. BOR Contractors | $ 143,976.00 | Not Contested |
| BOR Personnel Costs | $ 3,457,820.00 | Contested |
| BOR Indirect Costs | $ 3,143,533.00 | Contested |
| **TOTAL SITE COSTS:** | **$ 17,764,945.00** | |

the primary contractor utilized during Phase 3 of the removal action. Activities conducted by R & R included the removal of unconsolidated waste on the West Tract, the "staging," sorting, removal, and disposal of approximately 4,300 tons of waste containing hazardous substances, 24,000 gallons of hazardous wastewater, 2,100 tons of non-hazardous waste, and approximately 1,300 tons of metal. R & R also provided support services relating to the Krejci Site Remedial Investigation/Feasibility Study ("RI/FS").

In support of the costs paid to R & R, the U.S. submitted twenty-five vouchers/invoices, contractor invoice approval forms, and Treasury schedules. The Court has reviewed these materials and compared the amounts invoiced and paid to the amounts listed on the R & R cost summary contained at exhibit H–4. The figures used in the cost summary were rounded to nearest dollar; therefore, the figure the Court finds adequately and accurately documented differs slightly from the total listed on this exhibit and claimed by the U.S.[31] Based on this Court's independent review of the documents underlying the charges incurred by the U.S. in conjunction with the contract of R & R, the Court rejects 3M's argument that these costs were not adequately and accurately documented, and the Court finds that the U.S. incurred costs totaling $5,312,571.44.

▮▮▮ Defendant 3M raises an additional objection to the contractor costs of R & R, arguing that the U.S. cannot recover costs attributable to the removal of non-hazardous waste. The U.S. incurred costs in the amount of $252,800 for the removal of non-hazardous material.[32] In response, the U.S. cites the case captioned *U.S. v. 150 Acres of Land*, 204 F.3d 698 (6th Cir.2000), in which the Sixth Circuit affirmed the district court's decision allowing the recovery of costs incurred in removing empty drums. In reviewing the district court's decision, the Sixth Circuit stated that "[a]bsent evidence that there were sufficient residual materials on the drums to constitute a threat to the public health or welfare, removing the empty drums cannot be said to *advance* or *promote* the goals of the NCP." *Id.* at 710 (emphasis in original). The court, however, cited the permissive nature of the NC Plan and the reasonableness in removing the drums and found that the removal of the empty drums did not raise the costs significantly. Therefore, the court allowed recovery of these costs.

The U.S. states that non-hazardous debris was removed from the Krejci site because it was commingled with hazardous materials throughout the Site. The Court recognizes that, consistent with *150 Acres of Land*, costs incurred in the removal of non-hazardous material *may* be recoverable. However, the Court is unable to conclude, at the summary judgment stage, that the U.S.'s removal of this non-hazardous material was reasonable. Defendant 3M contends that the U.S. made the decision to remove non-hazardous material to further the NPS's purpose of restoring the

See Doc. No. 142, at ex. G–1.

**31.** In addition, the Court found an error with respect to invoice/voucher number 18 of contract number 1425–3–CC–81–18240. The U.S. lists the amount invoiced as $25,006; however, the correct amount is $25,000. *See* ex. H–3.

**32.** The U.S. stated that it paid $82 per ton to characterize, load, transport and dispose of

the 2100 tons non-hazardous debris and $62 to do the same with respect to the 1300 tons of reclaimable metal moved during Phase 3 by R & R. Using these figures, the Court determined that the U.S. spent a total of $252,800 for the removal of non-hazardous material.

Site for inclusion within the boundaries of the national park. Although the U.S. states that the non-hazardous materials were commingled with the hazardous materials, the Court is unable, at this stage, to conclude, as a matter of law, that the removal was reasonable. Accordingly, the U.S. is entitled to summary judgment in the amount of $5,059,771.44.[33]

### b. BOR's Personnel and Indirect Costs

■ The BOR also incurred substantial personnel and indirect costs with respect to the Krejci Site. Specifically, the U.S. seeks recovery of $3,457,820 in BOR personnel costs and $3,143,533 in BOR indirect costs. Defendant 3M, however, contends that the cost documents contain insufficient support for approximately $705,574 in alleged BOR personnel costs and for all of the BOR's alleged indirect costs.

The U.S. explains that there two categories of BOR personnel and indirect costs: (1) costs incurred by the BOR Technical Service Center ("TSC"); and (2) costs incurred by other offices. The personnel direct and indirect costs for non-TSC offices of the BOR are documented by employee time sheets, Official Time and Attendance Reports, Labor Cost Reports, and Bi-Weekly Labor List by Organization Reports. (*See* Doc. No. 142, at ex. A–8, ¶ 9). According to Wiley Wright ("Wright"), a Certified Public Accountant with Rubino & McGeehin, Chartered ("R & M"), the Labor Cost Reports and Bi-Weekly Labor List by Organization Reports show gross pay, government additives, leave additives, and general/supervisory additives per project, per pay period, for each employee. The personnel direct and indirect costs for TSC offices are documented by employee time sheets, Attend-

ance Reports, and TSC Labor Charges for HAZWASTE Work Reports. (*See* Doc. No. 142, at ex. A–8, ¶ 10). According to Wright, the TSC Labor Charges for HAZWASTE Work Reports shows direct costs, indirect costs, and total labor costs per project, per pay period, for each employee, calculated on the basis of that employee's skill level and billing rate. Regardless of the office, the report summaries submitted by the U.S. include the names of employees who did Site-related work, the pay period in which that work was done, the hours worked, and the corresponding personnel and indirect costs attributable to each employee.

The BOR's personnel and indirect costs incurred by the TSC are determined by using the BOR's billing methodology, which the U.S. has provided. (*See* Doc. No. 142, at ex. D–8 & Doc. No. 142, at ex. A–10, ¶¶ 6–14). The personnel and indirect costs for BOR non-TSC personnel are based on actual cost information and, therefore, do not rely on this methodology. The methodology used for determining TSC costs was reviewed by Wright, who compared the methodology's results to the actual costs for the TSC personnel and, based on this review, adjusted the billing methodology downward by 3.76% in order to achieve accuracy.

The U.S. has provided summaries of the documents relied upon by Wright in reviewing the personnel direct and indirect costs of the BOR's TSC and non-TSC offices. Wright admits in his declaration that, in some instances, only the Time and Attendance Report or the Labor Cost Report, not both, were available. Moreover, Wright explained how the direct and indirect costs are calculated when both reports are not available. (*See* Doc. No. 142, at ex. A–8, ¶ 12). Based on this information, the

---

**33.** The Court calculated this figure by subtracting the costs paid for the characterization, removal, and disposal of non-hazardous waste—$252,800—from the costs the Court found adequately and accurately documented—namely, $5,312,571.44

Court finds that the summaries submitted in support of the BOR's personnel and indirect costs are both adequate and accurate. Thus, 3M's objection to the lack of documentation for approximately $705,574 in alleged BOR personnel costs and for all of the BOR's alleged indirect costs fails to raise a genuine issue of material fact necessitating trial. The Court concludes that the U.S. is entitled to summary judgment with respect to the BOR's personnel costs in the amount of $3,457,820 and with respect to the BOR's indirect costs in the amount of $3,143,533.

### 3. DOJ Costs

■ The costs incurred by the DOJ are directly attributable to Site-related litigation and enforcement activities and are documented by the DOJ's attorney and paralegal timekeeping and payroll records. In addition, the DOJ has paid other direct costs associated with the litigation including case-specific travel costs and charges by court reporting services and outside photocopying services. The U.S. has submitted a cost summary for the DOJ, which indicates that the DOJ has paid $288,724 in direct labor costs and $143,592 in other direct costs incurred in connection with the Site through May 19, 2000.

Defendant 3M objects to these costs arguing that the cost documents supporting these figures contain insufficient support for approximately $611 in alleged DOJ personnel costs and $1,147 in alleged DOJ indirect costs, and contain no information to support approximately $337,589 in alleged indirect costs. According to 3M, there is no support within the cost documents for the indirect rates applied for the years 1991, 1999, and 2000 and, for some years, the application of the given rate does not yield the amount claimed.

In support of the costs attributable to the DOJ, the U.S. has submitted the declaration of William M. Kime ("Kime"), a certified public accountant with R & M, who supervised the review of the DOJ's cost documentation for the Site. The DOJ has contracted with R & M to assist in the accumulation, processing, and reporting of information relating to costs incurred by the DOJ's Environment and Natural Resources Division ("ENRD"). Pursuant to this contract, R & M produces a monthly report for the ENRD and the EPA that accounts for the ENRD expenditures for CERCLA cases prosecuted by the ENRD on behalf of the EPA. According to Kime, R & M assisted in the design of the procedures used to accumulate ENRD costs and account for those costs on a case-specific basis. (Doc. No. 142, at ex. A–11, ¶ 6). These procedures are based on generally accepted accounting principles and have been audited by the Office of the Inspector General on an annual basis since 1987.

The DOJ's cost summary is broken down into three categories: (1) direct labor costs; (2) other direct costs; and (3) indirect costs. Direct labor costs of attorneys and paralegals are calculated using electronic time data or information summarized from weekly time sheets prepared by ENRD employees and bi-weekly salary information supplied to R & M by ENRD. *See id.* at ¶ 8. R & M computes an "effective hourly rate" for each employee for each month by dividing the employee's monthly salary by the total number of hours worked in that month. This hourly rate is then multiplied by the hours the attorney worked on a particular case to calculate the cost of direct labor for that case for that month.[34]

Other direct costs are expenses specifically identified to a case through the

---

**34.** Beginning with the fiscal year 2000, direct labor costs were calculated using the same method as prior years except that the effective hourly rate was calculated on a bi-weekly basis. *See* Doc. No. 142, at ex. A–11, ¶ 8.

ENRD's accounting system. These items include, but are not limited to, costs paid for travel, expert witnesses, special masters, deposition and trial transcripts, and litigation support costs.

■ Finally, the indirect costs are those incurred by the ENRD to support the functioning of ENRD attorneys and paralegals in their performance on individual cases. Examples of these indirect costs include indirect labor (e.g., attorney and paralegal administrative time, secretarial support, accounting support, record keeping, and time keeping), compensated absences (e.g., vacation, holiday, and sick time), fringe benefits, office space and utilities, supplies, and training. These costs are allocated to all individual cases through the use of indirect allocation system designed by R & M. (See id.).[35]

The methodology employed by R & M to determine the DOJ's direct labor costs and other direct costs is adequately documented in the Kime declaration. Moreover, Defendant 3M has failed to produce any

evidence that such costs are not adequately documented thereby entitling the U.S. to summary judgment with respect to these costs, which total $432,315.43. While the methodology used to calculate the indirect cost rate is adequate, the Court is unable to verify what that cost rate was for the years 1991 through 2000. As a result, the Court is unable to consider 3M's argument that, for some years, the adjusted indirect rate does not yield the amount claimed. Given that the Court has found mathematical errors in previous calculations, the U.S. is not entitled to summary judgment with respect to the DOJ's indirect costs, which total $615,358.23.[36]

### 4. NPS Costs

The final costs for which the U.S. seeks recovery are those incurred by the NPS. The total amount of these costs is $641,699.98.[37] Neither 3M nor 3M's expert, Egan, have objected to these costs. (See Doc. No. 162, at stmts. 127–36). In addition, Defendant 3M has not raised any

35. The indirect costs rate is calculated by dividing the total amount of indirect costs for a fiscal year by a base consisting of the total ENRD direct labor costs for that fiscal year to produce a division-wide indirect cost rate by fiscal year. R & M then adds to the division-wide indirect rate, indirect costs that are only allocable to EPA Superfund cases to determine an EPA Superfund indirect cost rate for the purpose of calculating the reporting EPA Superfund case costs. However, because the Krejci Site is a non-Superfund case, R & M excluded all of the ENRD's EPA Superfund-

specific indirect costs (i.e., those indirect costs that support efforts on only EPA Superfund cases). (Doc. No. 142, at ex. A–11, ¶ 8).

36. The Court notes that Defendant 3M's expert and 3M have conceded that $276,623 in indirect costs has been accurately accounted for and adequately supported. The Court, however, denies summary judgment with respect to all of the DOJ's indirect costs, as there is no way for the Court to determine which of the $615,358.23 in indirect costs to apply the $276,623 conceded to by 3M.

37. This figure represents a total of the following charges:

| | | |
|---|---|---|
| NPS Personnel Costs | $166,379.00 | Not Contested |
| NPS Expenses for Federal Express | $ 51,981.00 | Not Contested |
| NPS Expenses for Document Support Services paid to Techlaw, Inc. | $246,144.72 | Not Contested |
| NPS Miscellaneous Contractor Costs | $ 66,669.26 | Not Contested |
| NPS Reimbursement to Ohio EPA | $160,526.00 | Not Contested |
| **Total Costs for the NPS:** | **$641,699.98** | |

inconsistencies with respect to these costs in either its motion for partial summary judgment or in its response to the U.S.'s motion for partial summary judgment as to response costs. Accordingly, the Court holds that the U.S. is entitled to summary judgment with respect to these costs.

### IV. Conclusion

■ Based on the foregoing, the Court will publish an order granting in part and denying in part the U.S.'s motion for partial summary judgment as to response costs. The Court concludes that the U.S. is entitled to response costs in the amount of $22,986,247.99. The U.S.'s motion as to response costs in the amount of $989,436.92 will be denied, and these costs will be the subject of the bench trial scheduled for the two-week period beginning October 15, 2001. Attached to this opinion is an appendix, prepared by the Court, which breaks down these totals and indicates what issues remain for trial with respect to the costs for which summary judgment will be denied.

In addition to the costs the U.S. has incurred with this removal action, the U.S. also seeks prejudgment interest. Section 107(a)(4)(D) of CERCLA states that responsible parties are obligated to pay prejudgment interest on all response costs at the rate specified for investments in the Hazardous Substances Superfund. This interest is calculated from the later of the date on which a demand for payment was made by the U.S. or the date that a particular cost was paid.

The U.S. made written demand on Defendant 3M on or around March 26, 1997. As the award of interest is mandatory,[38] the U.S. is also entitled to summary judgment with respect to the prejudgment interest on the amount of $22,986,247.99. The Court will delay ruling on the total amount of interest due the U.S. until the parties agree among themselves on an amount, or, in the event no agreement can be reached, supply the Court with affidavits calculating the amount of interest due.

## APPENDIX 1

IT IS SO ORDERED.

| Cost Identification | Amt. Claimed | Amt. for which SJ Granted | Amt. for which SJ Denied | Issues for Trial |
|---|---|---|---|---|
| EPA Payroll Costs | $ 69,052.34 | $ 69,052.34 | $ 0.00 | N/A |
| EPA Indirect Costs | $ 193,743.80 | $ 193,743.80 | $ 0.00 | N/A |
| EPA Region Travel Costs | $ 14,849.03 | $ 14,849.03 | $ 0.00 | N/A |
| EPA HQ Travel Costs | $ 384.69 | $ 384.69 | $ 0.00 | N/A |
| EPA cc-Ecology & Environment | $ 560.01 | $ 560.01 | $ 0.00 | N/A |
| EPA cc-Metcalf & Eddy | $ 2,209.39 | $ 2,209.39 | $ 0.00 | N/A |
| EPA cc-MAECORP | $ 3,958,886.43 | $ 3,845,824.45 | $ 107,534.25 | Other direct & indirect costs |
| EPA cc-Weston | $ 264,388.16 | $ 250,297.12 | $ 13,744.44 | Invoice # s 35 & 51 and JV 2128 |

**38.** *See U.S. v. Township of Brighton,* 153 F.3d 307, 321 (6th Cir.1998).

| | | | | |
|---|---|---|---|---|
| EPA cc-Jacobs Engin. | $ 23,172.31 | $ 23,172.31 | $ 0.00 | N/A |
| BOR cc-Ebasco/ Foster Wheeler | $ 4,902,574.00 | $ 4,902,574.00 | $ 0.00 | N/A |
| BOR cc-Harza | $ 217,263.00 | $ 217,263.00 | $ 0.00 | N/A |
| BOR cc–Woodward– Clyde | $ 183,120.00 | $ 183,120.00 | $ 0.00 | N/A |
| BOR cc-CASU | $ 268,380.00 | $ 268,380.00 | $ 0.00 | N/A |
| BOR cc-Rocky Mtn. Bank Card | $ 135,702.00 | $ 135,702.00 | $ 0.00 | N/A |
| BOR cc-Misc. Contractors | $ 143,976.00 | $ 143,976.00 | $ 0.00 | N/A |
| BOR cc-R & R | $ 5,312,577.00 | $ 5,059,771.44 | $ 252,800.00 | Charges for re-moval of non-hazardous material |
| BOR Personnel Costs | $ 3,457,820.00 | $ 3,457,820.00 | $ 0.00 | N/A |
| BOR Indirect Costs | $ 3,143,533.00 | $ 3,143,533.00 | $ 0.00 | N/A |
| DOJ Direct Costs | $ 432,315.43 | $ 432,315.43 | $ 0.00 | N/A |
| DOJ Indirect Costs | $ 615,358.23 | | $ 615,358.23 | Indirect costs—cost rate needed |
| NPS Cumulative Costs | $ 641,699.98 | $ 641,699.98 | $ 0.00 | N/A |
| **TOTAL** | $23,981,564.80 | $22,986,247.99 | $ 989,436.92 | |